E-FILED
Friday, 22 May, 2020  05:40:58 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| SANDRA YEH, M.D. and PRAIRIE EYE CENTER, LTD., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 20-3124 |
| | ) | |
| PRAIRIE E&L MANAGEMENT, LLC, a North Carolina Limited Liability Company, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

<u>OPINION</u>

RICHARD MILLS, United States District Judge:

Pending is the Plaintiffs' Emergency Motion for Clarification or Confirmation of Enforcement of Temporary Restraining Order entered by Sangamon County Circuit Judge Gail Noll in the Illinois Circuit Court Proceedings.

The Defendants' have filed a response and an emergency countermotion to dissolve Temporary Restraining Order.

The Plaintiffs filed a response to the emergency countermotion.

The Court has reviewed the entire record, including the state court filings and transcript of the hearing before Judge Noll.

# I.     BACKGROUND

Plaintiffs Sandra Yeh, M.D. and Prairie Eye Center, Ltd. filed a complaint for declaratory and injunctive relief in the Sangamon County Circuit Court on May 11, 2020.  Defendant Prairie E&L Management, LLC ("PELM") removed the action to this Court at 8:08 a.m. on May 15, 2020.  Judge Noll signed a temporary restraining order ("TRO") at 8:30 a.m., approximately 33 minutes before PELM submitted the Notice of Filing the Notice of Removal with the Sangamon County Circuit Clerk.

The conclusion of Judge Noll's TRO states that it is to "issue only after a sufficient bond is deposited with the Clerk of the Court."  The Plaintiffs state they were in the process of obtaining a TRO bond from an insurer upon receiving notice of the case's removal.  The $35,000.00 bond for the payment of costs and damages that Defendant may incur was issued on the morning of May 18, 2020.  The bond references both docket numbers (2020 CH 104 and 3:20-cv-03124).

Prior to entry of the TRO, the Parties participated in a videoconference hearing on the morning of May 14, 2020.  At the conclusion of the hearing, Judge Noll entered a docket entry allowing the Plaintiffs' motion for a TRO.  Judge Noll requested that Plaintiffs' counsel prepare a proposed written TRO, which was circulated on the afternoon of May 14, 2020.  Counsel for PELM requested the inclusion of language such as, "Order entered as of ___, but TRO to issue only after

a sufficient bond is deposited with the clerk." Counsel for Plaintiffs agreed with the proposed addition.

Therefore, the action was removed to this Court before Judge Noll signed the TRO. Judge Noll signed the TRO before the Sangamon County Circuit Court received notice of the removal. This happened on a Friday and bond was not deposited with the court until the next Monday, May 18, 2020. The Plaintiffs allege Judge Noll's Order should be deemed valid and enforceable now that a sufficient bond is on file. A bond was filed with this Court on May 20, 2020. The Plaintiffs ask the Court to clarify or confirm that Judge Noll's TRO is in full force and effect and will remain so until this Court issues a ruling following a preliminary injunction hearing.

PELM acknowledges that the TRO would ordinarily be effective, upon removal, if the bond had already been submitted to the circuit court clerk. There do not appear to be any cases addressing this precise scenario—when the order was signed prior to removal but the bond was not paid. The plain language of the Order provides that the TRO is to issue only after a bond is posted. Although that express condition was not satisfied, the Court will assume that the TRO was properly issued given that it was signed before the state court received notice of the removal and the posting of a surety bond is a rather technical requirement. Having determined the

TRO was issued, the Court will consider whether it meets the requirements of federal law.

## I.    FACTUAL ALLEGATIONS

### (1)

The Plaintiffs allege that during the summer and fall of 2017, Dr. Yeh entered into negotiations with representatives of Eli Global, a multinational corporation based in North Carolina, to sell various assets of Prairie Eye and prepare for her eventual future retirement.  Eli Global was founded by Greg Lindberg, a Yale University graduate and well-known businessman who invested in and/or purchased various businesses throughout the world.  The Plaintiffs claim Dr. Yeh was unaware that Lindberg was or soon would be the subject of a criminal probe by federal and state authorities who were investigating, *inter alia*, his practice of running a series of shell corporations to funnel assets from insurance companies he controlled into his private empire.  Lindberg was later indicted by federal authorities for bribery and wire fraud and was found guilty by a federal jury earlier this year.

The Plaintiffs allege Dr. Yeh began the process in July 2017, through discussions with Sam Goldberger, M.D., an ophthalmologist who identified himself as the Chief Operating Officer of Eli Global Ophthalmology Group.  The discussions with Eli Global representatives continued for several months, which eventually led

to a formal agreement in November of 2017.  The Plaintiffs state that many of these discussions involved Mike Gallup, then CEO of Century Vision Global LLC ("CVG" or "CVGlobal"), an Eli Global affiliated entity that would play a central role when the asset sale closed.

(2)

The Plaintiffs allege that, on or about November 16, 2017, Defendant PELM was formed as a North Carolina Limited Liability Company with Greg Lindberg as Managing Member.  On December 18, 2017, the Parties entered into an Asset Purchase Agreement wherein Dr. Yeh agreed and Prairie Eye agreed, *inter alia*, to sell, transfer and assign "[a]ll of the non-clinical assets" of Prairie Eye to PELM. Dr. Yeh signed the agreement on her own behalf and that of Prairie Eye, while Greg Lindberg signed on behalf of PELM.

The Plaintiffs claim the Asset Purchase Agreement incorporated certain related agreements which generally provided that Dr. Yeh would continue as the sole shareholder of Prairie Eye and manage the clinical or medical aspects of the practice for a period of three years from the date of closing, or until January 10, 2021. Thereafter, if she received the agreed purchase price and PELM complied with its contractual promises, the Asset Purchase Agreement (and related documents)

contemplated that Dr. Yeh would eventually retire and transfer her shares in Prairie Eye to one or more licensed Illinois physicians.

The Plaintiffs allege the "Purchase Price" consisted of several financial components, which primarily included:

1) cash in the amount of $17.9 million, subject to a working capital adjustment;

2) a promissory note issued by Eli Global payable over three years in the amount of $7.68 million; and

3) an Equity Equivalence Agreement which would provide additional compensation when Dr. Yeh retired from Prairie Eye and transferred her stock ownership to another licensed Illinois physician.

The Asset Purchase Agreement closed on or about January 10, 2018, and the Parties executed several related agreements and documents, signed copies of which are attached to the complaint.  One such exhibit is Dr. Yeh's Physician Employment Agreement, executed on January 10, 2018, by Dr. Yeh on behalf of Prairie Eye as Employer and as a Physician Employee.  Pursuant to the agreement, Dr. Yeh would remain employed as Medical Director of Prairie Eye for a term of three years, coinciding with the date Dr. Yeh contemplated retiring from Prairie Eye and

transferring her ownership shares to one or more licensed Illinois physicians.  Dr. Yeh is the lone signatory on behalf of Prairie Eye and as Physician employee.

Also attached as an exhibit is a Promissory Note in the amount of $7.68 million signed by Greg Lindberg, under which Dr. Yeh as Shareholder was to receive three payments of $2.65 million each, one on January 10, 2019, one on January 10, 2020 and one on January 10, 2021.

Another exhibit is the Equity Equivalence Agreement, which provides that Dr. Yeh shall receive a percentage of the fair market value of the company on or after January 10, 2021, her anticipated retirement date.

Attached as an exhibit is the Administrative Services Agreement ("ASA") between Prairie Eye and PELM, which governs the services PELM will provide to Prairie Eye as Manager of the non-clinical assets of the corporation.  Under the ASA, Prairie Eye agreed that PELM or its affiliates (defined as "Manager") would provide Prairie Eye with all non-medical management services relating to the practice. However, the ASA expressly prohibits PELM from interfering with decisions relating to the practice of medicine, including but not limited to decisions concerning the hiring, retention and termination of all medical personnel (MDs and ODs). Section 3.2 of the ASA provides, "Manager shall furnish to Group the services of all personnel reasonably necessary for the effective operation of Group and the Clinics,

other than: (i) Physicians." The section further provides, "Manager shall make all hiring, retention and termination decisions . . . for all non-clinical personnel. . . . With respect to any and all clinical personnel . . . Group shall make all hiring, retention, and termination decisions, determine compensation and staffing levels, individual work hours, personnel policies, and the terms, conditions, obligations and privileges of employment or retention of such Clinical Personnel."

Another exhibit is the Directed Stock Transfer Agreement ("Transfer Agreement") between PELM (defined as "Right Holder"), Prairie Eye and Dr. Yeh (defined as "Stockholder"). The Transfer Agreement was intended to provide continuity to patients and prevent interruption of medical services in the event of the Stockholder's termination or departure for any reason.

The complaint provides that Dr. Yeh received the initial amount of the Purchase Price promised at closing, in addition to the first payment due on the Promissory Note ($2.6 million on or about January 10, 2019). During the first year of the three year arrangement, PELM and its affiliates generally complied with the terms of the Asset Purchase Agreement and the ASA.

(3)

The Plaintiffs allege that the Wall Street Journal reported on February 28,

2019, that Greg Lindberg had diverted at least $2 billion from a group of life insurance firms "into his private empire."  The report provides that, soon after entering the insurance business, Lindberg went on a spending spree by buying nearly 100 companies around the world, an estate in the Florida Keys, an Idaho lakeside retreat, a Gulfstream jet, the most expensive mansion ever sold in Raleigh, N.C., and a 214-foot yacht with room for a dozen overnight guests.  Based on the Journal's extensive investigation, Lindberg lent "at least $2 billion from those insurers to scores of entities he controlled, using much of it to expand his private holdings."

On March 18, 2019, a federal grand jury indicted Lindberg and others for financial crimes including wire fraud and bribery.  The indictment alleged Lindberg and his associates promised to donate millions of dollars to the North Carolina Republican Party in exchange for favorable treatment of Global Bankers Insurance Group by North Carolina Commissioner of Insurance Mike Causey.

The Plaintiffs allege that in the summer of 2019, there were media reports that the FBI had seized $2 million in assets from political action committees controlled by Lindberg.  Moreover, North Carolina's insurance department took over a group of troubled life insurers owned by Lindberg and regulators obtained approval to place the insurers into a rehabilitation, which is a type of receivership akin to a bankruptcy reorganization.

The Plaintiffs claim that throughout 2019 and continuing into 2020, PELM experienced significant financial issues they believe were mainly due to Lindberg's legal problems.  During that period, PELM was unable to pay the agreed upon rent for buildings used by Prairie Eye at various locations.  Those buildings are owned by the Kane-Yeh Family Limited Partnership ("Lessor"), of which Dr. Yeh is a general partner and the entity has since been converted into an LLC.  In order to accommodate PELM's financial issues and to ensure the continued viability of Prairie Eye, Dr. Yeh agreed on multiple occasions to amend the terms and significantly reduce and defer rent owed.  An exhibit to the Plaintiffs' complaint provides that the third amendment in the latter part of 2019, resulted in outstanding rent of $438,680 owed to the Kane-Yeh Family Limited Partnership (now an LLC).

The Plaintiffs allege Prairie Eye medical doctors, Doctor of Optometry and corresponding sales of eyeglasses resulted in solid revenue.  However, PELM blamed its inability to pay bills on the doctors, claiming that the medical practice was not profitable.

At various points in 2019 and 2020, in hoping to maintain the continued viability of Prairie Eye and accommodate the financial problems of PELM and its affiliates, Dr. Yeh agreed at times to waive her compensation under her Physician Employment Agreement.

10

(4)

The Plaintiffs allege the second installment of $2.65 million, pursuant to the

Promissory Note executed by Gregory Lindberg, was not received on January 10,

2020.  No payment was received, thereby resulting in a default.  In late January, in

order to maintain the viability of the practice and accommodate PELM's and its

affiliates financial problems, Dr. Yeh agreed to a modification of the Promissory

Note to allow the second $2.65 million to be spread out over twelve months with the

final payment due on December 31, 2020.  The complaint states that Dr. Yeh has

been unable to locate a copy of that agreement and believes it is located at Prairie

Eye, but because of the illegal actions of PELM in purporting to terminate her

employment as Medical Director she lacks access to it.

(5)

On March 5, 2020, as the COVID-19 crisis was about to drastically affect the

way of life in the United States, Greg Lindberg was found guilty by a federal jury of

wire fraud and bribery.  Lindberg, who has appealed the conviction, faces a sentence

of up to 30 years.

The Plaintiffs allege PELM's financial situation continued to worsen,

exacerbated by the COVID crisis.  Prairie Eye had to furlough many of its doctors.

On April 9, 2020, because of the COVID crisis, Dr. Yeh agreed to permit PELM to

another deferral of all rent for the months of April and May and agreed to permit PELM to catch up on the deferred amounts by making increased payments beginning in June through December of 2020, after which the rental rates are to decrease to the rates previously in effect.  On the date of her alleged illegal termination, five of Prairie Eye's seven offices were closed, nine out of 17 doctors were furloughed and the remaining eight doctors were seeing approximately 25% of usual capacity.

The Plaintiffs claim that during the COVID lockdown period and prior to that time, Dr. Yeh made extensive efforts to insure the financial viability of Prairie Eye so that it will reopen and employees can return when the crisis ends.  Dr. Yeh obtained an SBA Paycheck Protection Program loan of approximately 434K for payroll and obtained a significant advance from Medicare.  Prior to the alleged illegal termination, Prairie Eye had a balance of approximately $3.4 million at PNC bank, part of which is intended to allow Prairie Eye to reopen when the COVID crisis subsides.

On April 14, 2020, PELM's Attorney Aaron Tobin, wrote Dr. Yeh's Attorney, Clay Cox, on April 14, 2020, stating that he had been informed Dr. Yeh was inaccurately representing that she had complete control over Prairie Eye Center.  The letter stated that, based on the Parties' agreements, PELM owns all non-medical assets and has the right to manage any function that does not require a physician's

medical judgment.  Tobin informed Cox "that the Practice will not capitulate to Dr. Yeh's demand to redefine the scope of ownership" and, if "Dr. Yeh make[s] good on her threat to harm PEC and the Practice as a whole, the Practice will have no choice but to seek enforcement of its rights via litigation."

The Plaintiffs allege that inexplicably and to the utter surprise of Dr. Yeh, on the morning of April 30, 2020, Dr. Yeh received a telephone call from Scott Hall (CEO of Six Sails group, an Eli Global affiliate), informing her that her employment was being immediately terminated because she posed a "danger" to Prairie Eye.  The Plaintiffs believe PELM timed its alleged illegal action, in part at least, to avoiding making its installment payments.  On April 29, 2020, Dr. Yeh had sent a text message to Hall advising that her bank had not yet received an incoming wire notice for the $200k payment.  Hall responded by stating: "Did not realize it was end of month.  Checking with team may nudge."  It was about 18 hours later that Dr. Yeh received the phone call from Hall allegedly terminating her.  During the call, Dr. Yeh asked Hall if she would be receiving the promised $200k payment, to which Hall responded: "We are not going to pay that."

Subsequently, Dr. Yeh immediately contacted her personal attorney, Clay Cox.  Later that morning, Attorney Cox sent an email to Hall challenging his authority to terminate Dr. Yeh from the medical practice that she owns.  The email

stated that neither CVGlobal nor PELM has any ownership interest in PEC and none of the employees or associates of either company serve as an officer or director of PEC.  Cox quoted Section 3.2 of the Administrative Services Agreement, noting that it precludes PELM, a non-medical entity, from involving itself in any "hiring, retention, and termination decisions" of any Clinical Personnel.  He claimed the plain language of Section 3.2 provided that Hall has no legal authority to terminate Dr. Yeh's employment.

The Plaintiffs allege that, approximately two hours after Attorney Cox sent the email to Hall, he received via email a letter from Attorney Aaron Z. Tobin, a partner at Condon, Tobin, Sladek and Thornton, wherein Tobin claimed he represented both Prairie Eye and PELM (which he defined collectively as the "Practice").  Tobin states the letter is to "serve as further notice that the Practice informed Dr. Yeh earlier today that her employment as a physician and Medical Director of the Practice is terminated for Cause effective today."  The letter does not identify the legal authority by which Tobin has authorization to represent Prairie Eye to terminate Dr. Yeh's employment as a physician and Medical Director of a medical practice in which she remained sole shareholder.  Tobin did not say who made the decision to terminate Dr. Yeh's employment.  The letter states that the decision is based on the "Practice's good faith determination, that she has engaged, or attempted to engage in illegal acts, failed to follow Practice policies and procedures, failed to follow

Practice directives, as well as engaged in actions that are detrimental to the interest and well-being of the Practice."  The letter lists eight paragraphs of "examples" of Dr. Yeh's alleged misconduct, including several which relate to her management of Clinical Personnel.  Dr. Yeh denies engaging in any "illegal acts" or other misconduct and maintains Tobin's attempt to effectuate termination of her employment is illegal and unauthorized.

The Plaintiffs allege that, although Attorney Tobin does not identify the person or persons who allegedly made the determination that Dr. Yeh had breached her employment agreement with Prairie Eye, the decision was likely made by Scott Hall or by Rhonda Buckholtz, the purported CEO of PELM and CVG who was assigned to assist with the administrative services performed by PELM under the ASA. Neither of these individuals are medical doctors licensed to practice medicine in Illinois or any other state.  The Plaintiffs claim they have no legal authority to terminate Dr. Yeh or "illegally" transfer her shares in Prairie Eye to another physician or physicians.  The only PELM and CVG personnel who have worked with Dr. Yeh have been non-medical personnel assigned to manage the non-clinical assets of Prairie Eye.

The Plaintiffs further allege PELM and its non-physician agents lack the authority to retain a law firm to terminate any medical doctor employed by Prairie Eye.  Moreover, PELM's actions are expressly forbidden under Illinois law.

Attorney Tobin's letter does not identify the person or persons who made the determination that Dr. Yeh breached her employment agreement with Prairie Eye. The Plaintiffs believe the decision was made by Scott Hall, who made the telephone call, or by Rhonda Buckholtz, the purported CEO of PELM and CVG.  Neither individual is a medical doctor licensed to practice medicine in Illinois or any other state.  The Plaintiffs claim they have no legal authority to terminate Dr. Yeh or direct her transfer of shares in Prairie Eye to other physicians.

The Plaintiffs further claim that, to the extent the "good faith determination" by "the Practice" was made pursuant to the Physician Employment Agreement which authorizes the Chief Operating Officer ("COO") "acting in good faith" to terminate the Physician in certain circumstances, the only COO of the Ophthalmology Group that Dr. Yeh has communicated with is no longer with the Ophthalmology Group.  Dr. Goldberger, the COO of Eli Global Ophthalmology Group during negotiations leading up to consummation of the Asset Purchase Agreement, left Eli Global in June of 2018.  The Plaintiffs allege Dr. Yeh has never received "direction" or instructions from Dr. Goldberger or any other physician purporting to act on behalf of the Ophthalmology Group.

16

The Plaintiffs allege all of the PELM and CVG personnel who have worked with Dr. Yeh have been non-medical personnel who managed the non-clinical assets of Prairie Eye.  Attorney Tobin's termination letter does not explain the legal basis for a termination when the individual who was terminated is the only signatory for the medical corporation to an employment contract with herself.

The Plaintiffs' complaint identifies a number of PELM-affiliated personnel who, since the closing of the Asset Purchase Agreement in January of 2018, have managed the non-clinical assets of Prairie Eye.  None of these individuals—Mike Gallup, Brandon Richards, Rhonda Buckholtz, Kelly McIntosh or Scott Hall—are medical doctors.

The Plaintiffs claim, on information and belief, that the current CEO of PELM/CVG was brought in to (1) orchestrate the transfer of Dr. Yeh's Prairie Eye stock; (2) to avoid paying Dr. Yeh the remaining amounts due on the Promissory Note; (3) to avoid paying amounts due to Dr. Yeh's LLC for deferred rent; (4) to reduce equitable value of the company, thereby reducing the amount Dr. Yeh is entitled to under the Equity Equivalence Agreement; and/or (5) to potentially gut portions of the practice and siphon money from the practice to fund other expenses of Greg Lindberg or his companies.

The Plaintiffs allege that in Dr. Yeh's absence, Prairie Eye has terminated or rescinded the employment relationship of a doctor, Joseph Faust, M.D., who was to begin employment working in the Jacksonville office in May 2020.  Dr. Faust was informed that Prairie Eye is considering closing the Jacksonville office.

Additionally, the Plaintiffs' claim PELM currently possesses several Prairie Eye corporate credit cards that Dr. Yeh personally guaranteed, including one with an $800,000 limit.  There was a balance of approximately $13,000 on one card and approximately $800,000 on another at the time of her departure.  PELM has not returned the cards to Dr. Yeh despite her demands.  On May 12, 2020, Dr. Yeh received a "Past Due Notice" from a representative of PNC Bank stating that $1.166 million is past due on a corporate Commercial Credit Card issued to Prairie Eye. The notice demands immediate payment by Dr. Yeh of $791,902.09.  The Plaintiffs state this is a high limit credit card to cover retina injection medications which are expensive but covered by Medicare and major medical insurances.  Dr. Yeh was required to pledge personal assets to obtain the card.  The Plaintiffs claim that since receiving the termination letter, Dr. Yeh has repeatedly asked PELM to pay off the outstanding balance in full and return the card.  Dr. Yeh has not received the card and payment has not been made.  Therefore, Dr. Yeh's personal assets are at risk of immediate seizure by PNC and her credit rating is in jeopardy.

In Count I of their complaint, the Plaintiffs seek a declaration under Section2-701 of the Code of Civil Procedure, 735 ILCS 5/2-701, that the purported termination of Dr. Yeh's employment from Prairie Eye is illegal and void and that she remains the lawful medical director of Prairie Eye.

In Count II, the Plaintiffs seek the following preliminary and permanent injunctive relief:

    (1) An order prohibiting PELM and its agents, successors and assigns from taking any action to transfer Dr. Yeh's stock in Prairie Eye to any other physician or entity;

    (2) A declaration that the purported termination of Dr. Yeh's employment from Prairie Eye is illegal and void;

    (3) An order granting Dr. Yeh access to all Prairie Eye places of practice so that she can resume her lawful and rightful positions as a physician and Medical Director; and

    (4) An order prohibiting PELM and its agents, successors and assigns from taking any adverse action relating to the employment of any medical doctors or Doctor of Optometry employed by Prairie Eye (including those on furlough due to the COVID crisis).

The Plaintiffs also seek attorney's fees and costs and any other orders that are necessary to restore the parties to their prior positions.

## II.     DISCUSSION

The TRO entered by Judge Noll ordered that Dr. Yeh be reinstated as Medical Director of Prairie Eye Center.  Among other actions, PELM was also temporarily

restrained from taking any action to effectuate the transfer or assignment of the shares of Prairie Eye Center from Dr. Yeh to any other person or entity.

PELM claims the TRO should be dissolved because it is infinite in duration and fails to comply with Federal Rule of Civil Procedure 65 in that it does not have a definitive end date.  To the extent that the TRO has no end date, PELM alleges the TRO may have become a preliminary injunction which the Court should dissolve. At the conclusion of the May 14, 2020 hearing, Judge Noll stated, "The TRO will be, the duration will last until the hearing on the preliminary injunction concludes, and I am going to say that is either the 27th or the 28th.  So, I will put in through the 28th."  Judge Noll's written order says the same thing.  Before the case was removed by the Defendant, therefore, the TRO had an end date of May 28, 2020.

In order to obtain a preliminary injunction, a movant must establish a (1) likelihood of success on the merits; (2) no adequate remedy at law exists; and (3) irreparable harm will result if the injunction is not granted.  *See Foodcomm Intern. v. Barry*, 328 F.3d 300, 303 (7th Cir. 2003).  The same standard applies to a party seeking a TRO.  *See Caterpillar, Inc. v. Walt Disney Co.*, 287 F.3d 913, 916 (C.D. Ill. 2003).

Federal Rule of Civil Procedure 65(b)(4) provides, "On 2 days' notice to the party who obtained the order without notice—or on shorter notice set by the court—

the adverse party may appear and move to dissolve or modify the order.  The court must then hear and decide the motion as promptly as justice requires."

An order to reinstate an employee is a mandatory injunction.  *See Chrysler Motors Corp. v. Int'l Union, Allied Indus. Workers*, 909 F.2d 248, 249 (7th Cir. 1990).  Such an injunction requiring the defendant to perform an affirmative act "imposes significant burdens on the defendant and requires careful consideration of the intrusiveness of the ordered act, as well as the difficulties that may be encountered in supervising the enjoined party's compliance with the court's order." *Kartman v. State Farm Mut. Auto. Ins. Co*., 634 F.3d 883, 892 (7th Cir. 2011). Mandatory injunctions should issue only "upon the clearest equitable grounds." *Graham v. Medical Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997) (citation omitted).

<u>Likelihood of success on the merits</u>

One factor in considering whether injunctive relief should be granted is the likelihood of success on the merits.  Judge Noll found "that there is a fair question [Plaintiffs] will succeed on the merits," which is a somewhat lower standard than the federal standard.  As the Plaintiffs note, the federal standard is not a particularly high one, as they must only demonstrate a "better than negligible chance of succeeding." *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999).

The Plaintiffs note that Section 3.2 of the Administrative Services Agreement, which was entered on January 10, 2018, precludes PELM, a non-medical entity, from involving itself in the "hiring, retention, and termination decisions" of any Clinical Personnel.  They claim the plain language of Section 3.2 provides that Scott Hall had no legal authority to terminate any medical doctor employed by Prairie Eye, especially the Medical Director who currently owns all shares of the medical corporation.  The Plaintiffs assert PELM's attempts to terminate Dr. Yeh and interfere with her discretionary decisions in managing the medical aspects of Prairie Eye have no legal basis and jeopardizes the business's continuity.

The Plaintiffs note Illinois law expressly forbids PELM from having "any part in the ownership, management, or control" of the medical practice.  *See Frydman v. Horn Eye Ctr.*, 286 Ill. App.3d 853, 859 (1st Dist. 1997) (quoting Section 13 of the Medical Corporation Act, 805 ILCS 15/13).  Only an Illinois licensed medical doctor can manage and control a medical corporation.

Section 1 of the January 10, 2018 Physician Employment Agreement entered into with Dr. Yeh provides in part that Dr. Yeh "shall be responsible for all duties customarily associated with such positions [Physician and Medical Director], subject to the direction of the then current Chief Operating Officer of the Ophthalmology Group (the "COO")."  Her duties as Medical Director generally "include, without limitation, supervisory authority over the ophthalmologists,

optometrists, and clinical staff at any ophthalmology or optometry practice acquired by the Buyer."

Section 2, <u>Duties</u>, provides in part that Dr. Yeh shall "faithfully perform . . . all reasonable additional duties customarily associated with the role of described in <u>Section 1</u> above as may be prescribed from time to time by the COO. . . . For clarity, references in this Agreement to the exercise of discretion by the Company shall be interpreted to refer to the COO."  Section 2 concludes by stating, "Nothing in this Agreement shall be construed as controlling or directing the methods by which [Dr. Yeh], in Dr. Yeh's professional judgment, shall practice medicine."

Section 5, <u>Termination</u>, addresses how the Agreement and Dr. Yeh's employment by Prairie Eye Center "shall or may be terminated." Section 5(c), <u>Termination by the Company</u>, provides that Dr. Yeh's "employment by the Company shall or may be terminated . . .  (iv) 'for cause' . . . [which] shall be determined by the COO acting in good faith and shall mean: (A) Any material breach of the terms of this Agreement by the Physician, or the material failure of the Physician to diligently and properly perform the Physician's duties for the Company; . . . (C) Any material failure to comply with the Company Policies or any other written policies and/or directives of the COO."  The Agreement provides that Section A and C constitute "for cause" events only if "(i) the Company notifies the Physician of such event; and (ii) the Physician fails to cure such event within fifteen

(15) days of the receipt of such notice." Section 5(c)(iv)(E) of the Agreement provides that Dr. Yeh's employment could be terminated for an "illegal act . . . or any other action whether or not dishonest or illegal by the Physician which is materially detrimental to the interest and well-being of the Company." Section 5(c)(iv)(K) provides that Dr. Yeh's employment may be terminated:

> Upon any event or acts or conduct of Physician that affects Physician's quality of services and/or ability to provide services provided pursuant to this Agreement and that would, in the fair and reasonable judgment of the Company, be deemed prejudicial to patient care, the reputation or operations of the Company, or the best interest and welfare of the Company or its patients or may subject the Company or any of its employees to potential liability or damage to its reputation.

The Physician Employment Agreement appears to provide that as Physician and Medical Director, Dr. Yeh agreed to be subject to the direction of the COO of the Ophthalmology Group. The Agreement lists several ways that Dr. Yeh could be terminated for cause. As the Plaintiffs have pointed out, however, the only signatory to that Agreement is Dr. Yeh. Dr. Yeh signed the Agreement on behalf of the Company, Prairie Eye Center, Ltd., and on her own behalf as the Physician. It is unclear whether the COO would have any authority to terminate Dr. Yeh if none of the Defendant's representatives signed the Physician Employment Agreement.

PELM alleges that Dr. Yeh has fostered and encouraged a toxic work environment.  There have been multiple complaints from Prairie Eye physicians and staff regarding disrespectful behavior.  PELM claims that two doctors have resigned this year because of Dr. Yeh's leadership style and the toxic work environment.

The April 30, 2020 letter from Attorney Tobin to Attorney Cox stated Dr. Yeh was being terminated based on a determination she "has engaged, or attempted to engage in illegal acts, failed to follow Practice policies and procedures, failed to follow Practice directives, as well as engaged in actions that are materially detrimental to the interest and well-being of the Practice."  The letter states that Dr. Yeh has damaged the Practice, including but not limited to violating Practice policies by having staff sign her medical charts; ordering a furloughed employee to continue working; offering to pay the furloughed employee in cash; interfering with other physicians' medical judgments by accessing their patient charts and sending harassing text messages; refusing to use the Practice's physician agreements and avoiding the advice of PELM's in-house counsel in violation of Practice policies.

PELM states that the termination was warranted for these reasons and it will provide evidence of the corporate structure of the Eli Global entities in which the ophthalmology groups such as Prairie Eye Center were organized.  PELM claims Dr. Yeh was terminated with the consent of the highest level executives.

Even assuming the Physician Employment Agreement is enforceable by PELM, it would not appear to permit PELM's attorney or Scott Hall, CEO of Six Sails Group which had oversight over the ophthalmology groups owned by Eli Global companies, from making the decision to terminate Dr. Yeh.  Nor would it seem to permit current CEO Rhonda Buckholtz to make the termination decision. More significantly, Illinois law would not permit someone who is not a licensed medical doctor from making such a determination.  If one of PELM's high level executives is a licensed physician acting as COO, that individual might have the legal authority to terminate Dr. Yeh assuming the Employment Agreement is enforceable.

The Court concludes that Plaintiffs have a better than negligible chance of succeeding on the merits primarily because it is unknown who made the decision to terminate Dr. Yeh and whether that person was authorized under the Physician Employment Agreement signed only by Dr. Yeh.  It is also not apparent that the decisionmaker was an Illinois physician who would have been authorized to make terminate Dr. Yeh's employment.  Accordingly, the first factor favors the Plaintiffs.

Irreparable harm

The Plaintiffs allege Dr. Yeh is suffering the following irreparable harm: 1) a deprivation of ownership of her shares of the medical corporation through the

unauthorized actions of PELM and its attorneys, successors and assigns; 2) she is unable to treat her patients who require necessary medical care; and 3) a non-medical entity is violating Illinois law by attempting to take control of a medical corporation.

A plaintiff seeking preliminary relief must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). The possibility of a future injury is not enough to warrant such relief. *See id*.

Dr. Yeh seeks an "order prohibiting PELM and its agents, successors and assigns from taking any action to transfer Yeh's stock in Prairie Eye to any other physician or entity." The Directed Stock Transfer Agreement identifies PELM as the "Right Holder." Section 1.4 of the Agreement authorizes the Right Holder to give Dr. Yeh 10-days' notice of a closing date on which Dr. Yeh will be required to transfer her shares. Under Section 1.2(k), "the termination of the Physician Employment Agreement by either party" is an event which triggers PELM's right to give the 10-days' notice requiring Dr. Yeh to transfer her shares.

Dr. Yeh states that, in the April 30, 2020 letter, PELM "purported to terminate her" and "threatened to illegally transfer all her shares in the medical corporation to two other physicians who have no ownership in Prairie Eye." Dr. Yeh has not

alleged that she was given 10-days' notice to transfer her shares so in that sense the harm may not be imminent.

PELM claims that any potential harm due to an illegal transfer of stocks is speculative.  Accordingly, injunctive relief is not warranted on this basis.  Given the questions surrounding whether Dr. Yeh was properly terminated, however, it is also questionable as to whether PELM would have a legal basis to transfer her shares.

"Irreparable harm is harm which cannot be repaired, retrieved, put down again, atoned for . . . The injury must be of a particular nature, so that compensation in money cannot atone for it."  *Graham*, 130 F.3d at 296.  A plaintiff who can be fully compensated by money damages "has an adequate remedy at law and has not suffered an irreparable injury."  *Shaffer v. Globe Protection, Inc.*, 721 F.2d 1121, 1123 (7th Cir. 1983).  "Courts routinely tote up and award as damages the loss inflicted by wrongful terminations of distributorships."  *Micro Data Base Systems, Inc. v. Nellcor Puritan Bennett, Inc.*, 165 F.3d 1154, 1157 (7th Cir. 1999) (noting that instead of acting as a remedy, an injunction would be rewriting the parties' contract).

In *Sampson v. Murray*, 415 U.S. 61 (1974), the Supreme Court set a high standard for obtaining preliminary injunctive relief restraining termination of employment.  While noting such relief was not foreclosed in a genuinely

extraordinary situation, the Court found that the type of irreparable injury required must really depart from the harms common to most discharged employees. *Id*. at 92 & n.68. The plaintiffs' alleged humiliation, damage to reputation and loss of income due to purportedly wrongful termination from federal employment did not rise to the level of an extraordinary termination that would qualify as "irreparable" to warrant preliminary injunctive relief. *Id*. at 92.

In *Bedrossian v. Northwestern Memorial Hosp.*, 409 F.3d 840 (7th Cir. 2005) applied *Sampson* in holding that a physician's lost income and damaged reputation did not constitute irreparable harm that would justify a preliminary injunction, even if termination will result in a "deterioration in skills" and the physician is unable to find another position. *See id*. at 846. Damages are an appropriate remedy in such cases. *See id*. at 845.

Based on these cases, the Defendant claims that Plaintiffs' alleged harms in this case do not constitute the type of irreparable injury which would warrant preliminary injunctive relief. The alleged harms can be compensated via money damages. The same is true for the loss of any corporate stock. *See Lucente v. International Business Machines Corp.*, 310 F.3d 243, 262 (2d Cir. 2002).

The Court recognizes that a mandatory injunction is an extraordinary remedy. As the Plaintiffs allege, however, this does not appear to be a routine employment

discharge.   Based on the information currently before Court, it is questionable whether the termination complied with Illinois law.  This is the type of extraordinary case recognized in *Sampson* in which injunctive relief appears to be warranted.  *See Sampson*, 415 U.S. at 92 n.68 ("We recognize that cases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable harm might be found.  Such extraordinary cases are hard to find in advance of their occurrence.").  In most cases, money damages for loss of income and damage to reputation foreclose a finding of irreparable harm.   That does not appear to be the case here.  At this stage, it is unclear whether PELM had the authority to take the action that it did.  The employment contract is signed only by Dr. Yeh, on behalf of Prairie Eye and the Physician employee.   No PELM representative signed it.  Because there is no indication the decision was made by a medical doctor, it is unclear whether it complied with Illinois law.  Under these circumstances, money damages for a wrongful termination and loss of stock shares do not appear to be an adequate legal remedy to compensate for the irreparable harm.

Additionally, the Plaintiffs point to Dr. Yeh's lost control of the medical corporation in which she is--and remains--the sole shareholder.  She has lost the ability to treat and examine patients.  PNC Bank may seize over $1 million of her personal assets because PELM has not made any payments on a commercial credit

card that she personally guaranteed (and one that is used <u>solely</u> for the practice of medicine).  Certainly, the seizure of personal assets because of her lack of access to a business credit card would likely result in irreparable harm personally to Dr. Yeh.

Based on all of these circumstances, including PELM's apparent financial difficulties, the Court concludes that Plaintiffs have demonstrated a likelihood of success on the merits, no adequate remedy at law and that irreparable harm will result in the absence of an injunction.

Based on the foregoing, the Court agrees with Judge Noll and concludes that Plaintiffs are entitled to a TRO.

<u>Ergo</u>, the emergency countermotion of Defendant Prairie E&L Management, LLC, to dissolve the Temporary Restraining Order [d/e 9] is DENIED.

The emergency motion of Plaintiffs Sandra Yeh, M.D. and Prairie Eye Center for clarification or confirmation of enforcement of Temporary Restraining Order entered by Sangamon County Circuit Judge Gail Noll [d/e 7] is GRANTED, to the extent that the Court concludes the TRO remains in effect until the Court issues a ruling at the conclusion of the preliminary injunction hearing.

Judge Noll's TRO remains in effect:  IT IS HEREBY ORDERED:

1. Defendant, Defendant's affiliates, successors, assigns, and all persons and entities acting in concert with Defendant or by and through Defendant, are

temporarily restrained from taking any action to effectuate the transfer or assignment of the shares of Prairie Eye Center, Ltd. from Dr. Yeh, to any other person or entity;

2. Dr. Yeh is reinstated as Medical Director of Prairie Eye Center, Ltd., possessing all the rights and powers accompanying that position for the term of this Order;

3. Dr. Yeh shall be permitted to access all Prairie Eye places of practice so that she can resume her lawful and rightful positions as a Physician and Medical Director of Prairie Eye;

4. PELM and its agents, successors and assigns are prohibited from taking any adverse action relating to the employment of any medical doctors or Doctor of Optometry employed by Prairie Eye (including but not limited to doctors currently on furlough due to the current COVID crisis);

5. PELM is ordered to immediately restore Dr. Yeh's biographical information to Prairie Eye's website (and all other information that related to Dr. Yeh as it existed prior to the termination), and take all other actions necessary so that Dr. Yeh can properly function as medical Director, have access to patients, and resume all of her customary duties in both managing Prairie Eye as Medical Director and treating her patients;

6. This temporary restraining order is conditional upon Plaintiffs posting a surety bond in the amount of $35,000.00 for the payment of costs and damages as may be incurred or suffered by Defendant.  That amount has been posted with this Court.

7. A hearing on the Plaintiffs' request for a Preliminary Injunction is set for June 11, 2020 at 2:00 p.m.  The Temporary Restraining Order shall remain in effect until this Court issues a ruling at the conclusion of the preliminary injunction hearing.

ENTER: May 22, 2020

FOR THE COURT:

/s/ *Richard Mills*
Richard Mills
United States District Judge